**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ACCELOR CORP., D/B/A SUPPLY RISK SOLUTIONS, AND PATRICK BRENNAN,<br><br>Plaintiffs,<br><br>v.<br><br>MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH, MAYO CLINIC, HEALTHCARE INDUSTRY RESILIENCE COLLABORATIVE, ASSOCIATION, AND JESSE M. SCHAFER,<br><br>Defendants. | C.A. No. _____<br><br>**COMPLAINT<br>(PATENT INFRINGEMENT)**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Accelor Corp. and Patrick Brennan (collectively, "Accelor"), by and through their undersigned counsel, for their Complaint against Defendants Mayo Foundation for Medical Education and Research ("Mayo Foundation"), Mayo Clinic ("Mayo Clinic") (collectively, "Mayo"), Healthcare Industry Resilience Collaborative, Association ("HIRC"), and Jesse M. Schafer ("Schafer"), states and alleges as follows:

## THE PARTIES

1.      Accelor Corp. is a California corporation with its principal place of business at 1755 E. Bayshore Rd., Suite 14B, Redwood City, California, 94063.

2.      Patrick Brennan is the founder and owner of Accelor Corp. and a citizen of the State of California.

3.      Mayo Foundation is a Minnesota nonprofit corporation with its principal place of business at 200 First Street SW, Rochester, Minnesota, 55905.

4.     Mayo Clinic is a Minnesota nonprofit corporation with its principal place of business at 200 First Street SW, Rochester, Minnesota, 55905.

5.     HIRC is a Delaware nonprofit corporation with its principal place of business at 4446 Arcon Lane NW, Rochester, Minnesota, 55901 and its registered agent at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

6.     Schafer is a citizen of the State of Minnesota, is the Senior Manager of Business Continuity, Medical Device, for Mayo Clinic, and is the Executive Director of HIRC.

## JURISDICTION AND VENUE

7.     This is an action for, among other claims, patent infringement arising under the Patent Act of the United States, 35 U.S.C. § 1, *et seq.*

8.     This Court has original and exclusive subject matter jurisdiction of Accelor's patent infringement claims under 28 U.S.C. §§ 1331 and 1338(a).

9.     This Court has original subject matter jurisdiction of Accelor's claim for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

10.     This Court has supplemental jurisdiction over Accelor's state law pursuant to 28 U.S.C. § 1367(a), as they are so related to Accelor's federal claims that they form a part of the same case or controversy.

11.     This Court has general personal jurisdiction over HIRC because HIRC is incorporated in Delaware.

12.     This Court has general personal jurisdiction over Schafer because Schafer is the Executive Director of HIRC, a Delaware nonprofit corporation.

13.     This Court has general personal jurisdiction over Mayo Foundation and Mayo Clinic because they are the founders of HIRC, a Delaware nonprofit corporation.

14.    Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), and 1400(b), because HIRC resides in this district, has committed acts of infringement in this district, and is incorporated in this district, and because Mayo and Schafer acted in concert with HIRC to infringe Accelor's patents and otherwise infringe Accelor's rights.

## FACTUAL ALLEGATIONS

## I.    ACCELOR AND THE TECHNOLOGY AT ISSUE

15.    Accelor's business is providing supply chain risk management services to health care providers. Through Accelor's services, health care providers can monitor the suppliers of the medical devices, pharmaceuticals, and other products they purchase, assess the risk of disruptions in the supply of those products, and act to prevent or ameliorate such disruptions.

16.    To provide its supply chain risk management services, Accelor developed software that uses data to assess supply chain risk (the "Supply Risk Solutions Product" or "SRS Product"). Using data obtained from suppliers of medical products as well as licensed data sources, the SRS Product assesses a broad variety of risks of supply chain disruption for over 1,000,000 products. Customers of Accelor's SRS Product can access the information and analysis needed to manage their supply chain risks via a web portal. Accelor licenses the SRS Product to its customers, thereby providing software as a service (SaaS).

17.    Accelor introduced the earliest version of its SRS Product in 2007. At the outset of its business, Accelor focused on supply chain risk management for electronics. In 2018, Accelor expanded its SRS Product to provide supply chain risk management services for the health care industry. The health care SRS Product has the same code base as the earlier version that focused on electronics; the only differences are in the configuration of the product.

18.    The heart of the SRS product is the supply chain risk data repository collected by

SRS from health care product suppliers and other data sources, which is used to provide visibility into supply chain locations and the products manufactured and distributed at each location, to monitor disruptions of the locations, to assess supplier risk management capabilities, and to assess disruption risks for each supply chain location and health care product in the system. Over time, Accelor's wealth of experience and expertise have enabled it to identify the most relevant information for risk assessment and management. This includes information regarding the geographic location of the supplier's facilities and products; such information allows the assessment of risks caused by geopolitical issues, weather, and disasters such as wildfires or earthquakes. It also includes information on each supplier's resilience, disaster recovery plan, and other risk management practices, which can mitigate supply chain risks. It also includes financial information about the suppliers, which can assist in the assessment of risk associated with business disruptions due to financial difficulties.

19. To obtain the critical data that underlies the risk management analysis provided by the SRS Product, Accelor has developed proprietary methods and technology to use supplier capability questionnaires to identify gaps in supplier risk management capabilities, to automatically manage the improvement of supplier capabilities, monitor the capabilities so that improvements are maintained, to manage permissions of the organizations who should have access to the information, and to generate reports for permitted organizations. The types of information that Accelor requests and obtains from suppliers, and the means it uses to collect that information (the "SRS Questionnaire"), and to create the data repository and to manage organization access permissions to it (the "SRS Data Repository"), is confidential and proprietary to Accelor. Accelor's methods and tools used to collect supplier information, including the SRS Questionnaire, are confidential and constitute trade secrets.

20.     The effectiveness of the SRS Product is also based on Accelor's proprietary methods and technology for creating a database of the supply chain network by collecting supplier and sub-tier site locations, site operations, relationships between sites, and items related to those sites ("SRS Mapping"), and incorporating that data into its risk management methodology. SRS Mapping is also confidential and constitutes Accelor's trade secrets.

21.     Accelor has taken reasonable steps to protect its SRS Questionnaire, SRS Data Repository, SRS Mapping, and its other confidential and trade secret information and techniques. For example, SRS enters into confidentiality agreements with its customers and other entities with whom it shares its confidential and trade secret information.

22.     Brennan has applied for and obtained patent protection for his proprietary systems and products. Brennan is the patentee, and Accelor is the exclusive licensee, of U.S. Patent No. 8,515,804 B2 ("the '804 Patent"), entitled "System and Method for Managing Partner Organizations," and U.S. Patent No. 10,853,754 B2 ("the '754 Patent"), entitled "System and Method for Managing Supply Chains Across Separate Organizations." A true and correct copy of the '804 Patent is attached hereto as Exhibit A, and a true and correct copy of the '754 Patent is attached hereto as Exhibit B.

23.     Today, more than 450 health care providers use the SRS Product.

## II.    THE RELATIONSHIP BETWEEN ACCELOR AND MAYO

24.      Mayo was the first health care provider customer of the SRS Product.

### A.    <u>The 2018 Confidentiality Agreement Between Accelor and Mayo Foundation</u>

25.     In early 2018, Mayo was considering entering into a license agreement for the SRS Product. On May 16, 2018, Accelor and Mayo Foundation entered into a Confidentiality Agreement so that the parties could discuss and negotiate a potential agreement regarding the SRS

Product (the "2018 Confidentiality Agreement").

26.     Section B of the 2018 Confidentiality Agreement barred Mayo from using Accelor's confidential information for any purpose other than the evaluation of the SRS Product and other purposes expressly indicated in the agreement. It also barred Mayo from disclosing Accelor's confidential information to any third party without Accelor's prior written consent.

27.     Pursuant to Section B of the 2018 Confidentiality Agreement, Mayo could disclose Accelor's confidential information to it employees and other representatives only if those individuals had a need to know the information for purposes of the agreement, and only if such representatives were bound by the terms of the 2018 Confidentiality Agreement.

**B.     The 2018 Product Evaluation Agreement Between Accelor and Mayo Foundation**

28.     On November 30, 2018, Accelor and Mayo Foundation entered into a Product Evaluation Agreement, pursuant to which Mayo would evaluation the SRS Product and its potential for use by Mayo (the "2018 PEA").

29.     Pursuant to Section 2 of the 2018 PEA, Accelor granted to Mayo a license to use the SRS Product during an evaluation period.

30.     Section 3 of the 2018 PEA provided that Accelor would retain the "sole and exclusive title to, and ownership of, the" SRS Product, and Section 2 prohibited Mayo from providing the SRS Product software to any third party without Accelor's permission, or from reverse engineering, reverse decompiling, or reverse assembling the SRS Product software.

31.     Section 8 of the 2018 PEA was a confidentiality provision that required Mayo to protect the confidentiality of Accelor's confidential information and barred Mayo from using that information for any purpose other than its business dealings with Accelor.

32.     The confidentiality provision of the 2018 PEA barred Mayo from disclosing

Accelor's confidential information to third parties, and permitted Mayo to disclose that information to its employees, agents, or contractors who had a need to know the information, so long as those individuals were bound by the confidentiality provision.

### C. The 2019 Confidentiality Agreement Between Accelor and Mayo Foundation

33. In 2019, Accelor and Mayo Foundation entered into a Confidentiality Agreement for the purpose of protecting the parties' confidential information during the negotiation of an agreement relating to Schafer and Erich R. Heneke (the "2019 Confidentiality Agreement").

34. Section B of the 2019 Confidentiality Agreement barred Mayo from using Accelor's confidential information for any purpose other than the negotiation of the identified agreement. It also barred Mayo from disclosing Accelor's confidential information to any third party without Accelor's prior written consent.

35. Pursuant to Section B of the 2019 Confidentiality Agreement, Mayo could disclose Accelor's confidential information to its employees and to other representatives only if those individuals had a need to know the information for purposes of the agreement, and only if such representatives were bound by the terms of the 2019 Confidentiality Agreement.

### D. The 2019 Master Agreement Between Accelor and Mayo Foundation

36. On January 25, 2019, Mayo Foundation and Accelor entered into a Master Agreement pursuant to which Accelor licensed the SRS Product to Mayo (the "2019 Master Agreement"). Pursuant to Section 4.1, the term of the 2019 Master Agreement was one year, and automatically renewed annually unless one of the parties provided 60 days' written notice of its intent to not renew.

37. Section 7.1 of the 2019 Master Agreement provided that the SRS Product is "and shall remain the sole and exclusive property of" Accelor. Further, all "modifications,

enhancements, updates, derivative works and translations" of the SRS Product "shall be deemed a part thereof" and, therefore, the property of Accelor.

38.    Section 7.2 of the 2019 Master Agreement provided that "Mayo Content" was and would remain the property of Mayo. The agreement defined "Mayo Content" as "the data and any computer program/s in object and source code and other related data … that Mayo and its Authorized User(s) furnish to Vendor." The SRS Product and Accelor's confidential and trade secret information, including the SRS Questionnaire, SRS Data Repository, and SRS Mapping, were not furnished to Accelor by Mayo and do not constitute Mayo Content pursuant to the 2019 Master Agreement.

39.    Section 7.3 of the 2019 Master Agreement provided that all "Deliverables prepared for or submitted to Mayo by [Accelor] for Mayo's sole use as specified in the PS [Product Schedule] and SOW [Statement of Work] under this Agreement shall belong exclusively to Mayo and shall be deemed 'Works Made for Hire.'"

40.    On February 21, 2019, Mayo Foundation and Accelor entered into a Product Schedule that was expressly made a part of the 2019 Master Agreement. Pursuant to the Product Schedule, Accelor agreed to provide to Mayo under the license agreement set forth in the 2019 Master Agreement a list of data and services that constitute the SRS Product. The Product Schedule does not require or provide that Accelor prepare or submit to Mayo any deliverables for Mayo's sole use, nor does it identify any "Works Made for Hire."

41.    Mayo Foundation and Accelor did not enter into any Statements of Work pursuant to the 2019 Master Agreement.

42.    Section 9 of the 2019 Master Agreement was a confidentiality provision that required Mayo to protect the confidentiality of Accelor's confidential information and barred

Mayo from using that information for any purpose other than its business dealings with Accelor.

43.    The confidentiality provision of the 2019 Master Agreement barred Mayo from disclosing Accelor's confidential information to third parties, and permitted Mayo to disclose that information to its employees, agents, or contractors who had a need to know the information, so long as those individuals were bound by the confidentiality provision.

44.    In November 2019, after the 2019 Master Agreement had been in place for nine months, Schafer, in his capacity as Manager, Business Continuity, Medical Device, for Mayo acknowledged the unique and valuable nature of Accelor's confidential and trade secret information: "[Accelor's] software has a deep database of similar Qs that have the benefit of risk predictability and machine learning associated with them—since they can be tied to outages/shortages of those current vendors—which can then be traced back to how those vendor's responded to related BCP Qs from the database."

### E.    The SRS Terms of Service

45.    On November 22, 2021, Accelor entered into an agreement with Vizient, Inc., pursuant to which Vizient marketed the SRS Product to Vizient's customers, administered contracts with any Vizient customers who purchased the service, and licensed the SRS product to Vizient customers pursuant to Terms of Service (the "SRS Terms of Service"). Thereafter, Mayo agreed to the SRS Terms of Service on February 21, 2022, and May 15, 2025.

46.    Section five of the SRS Terms of Service provided that the SRS Product was owned and operated by Accelor.

47.    Pursuant to Section six of the SRS Terms of Service, Mayo agreed not to "modify, translate, or create derivative works, adaptations, or compilations of, or based on, the Services or any part thereof, or copy reproduce, license, sublicense, or sell access to the Services or any part

thereof, or any Service Materials, other than as expressly permitted in" the SRS Terms of Service.

48.    Section nine of the SRS Terms of Service provide that, if Mayo provided any input and/or suggestions to Accelor regarding problems with or proposed modifications or improvements to the Services—called "Feedback" in the SRS Terms of Service—such Feedback "is considered Accelor's proprietary information."

49.    Section 13 of the SRS Terms of Service is a confidentiality provision that requires Mayo to protect the confidentiality of Accelor's confidential information.

50.    On or about May 15, 2025, May renewed its agreement to SRS's Terms of Service (the "2025 SRS Terms of Service"). The terms of the 2025 SRS Terms of Service were substantially the same as the terms of the SRS Terms of Service.

## III.    THE RELATIONSHIP BETWEEN ACCELOR AND HIRC

51.    In 2019, Mayo Clinic, with Corewell Health, created HIRC.

52.    On March 1, 2022, Accelor and HIRC entered into a three-year Sponsorship and Collaboration Agreement (the "HIRC Agreement").

53.    Pursuant to the HIRC Agreement, Accelor had the exclusive right to be identified as HIRC's preferred software solution for Accelor's product scope.

54.    The HIRC Agreement described Accelor as "a SaaS (software as a service) company that owns patented software and proprietary methods for supply chain risk management for direct and indirect suppliers, including but not limited to the following: event monitoring, supplier incident impact surveys; suppler data gathering, risk assessment, prediction, and prevention of supply chain risks; and supplier financial health assessment and prediction. SRS' offering includes a risk management reporting portal, and Application Programing Interface (API), and phone app ...."

55.    HIRC received certain benefits as a result of the HIRC Agreement, including the ability to offer its members a version of Accelor's software called SRS QuickStart at no cost to its healthcare provider members. HIRC promoted SRS QuickStart to its provider members.

56.    Pursuant to the HIRC Agreement, Accelor also permitted HIRC to display the then-current version of the SRS Questionnaire on the HIRC website and to list on the HIRC website that suppliers should enter their Mapping data into SRS.

57.    Pursuant to the HIRC Agreement, Accelor permitted HIRC to collect the SRS Questionnaire, SRS Data Repository, and SRS Mapping data from suppliers in an Excel formal for its healthcare provider members only, in addition to asking suppliers to enter the data into SRS, and in addition to marketing SRS as the preferred solution for its healthcare provider members. The permission for HIRC to use the SRS Questionnaire, SRS Data Repository, and SRS Mapping ended on March 1, 2025, when the HIRC Agreement expired.

58.    Section 9 of the HIRC Agreement is a confidentiality provision that requires HIRC to protect the confidentiality of Accelor's confidential information. The confidentiality provision bars HIRC from using Accelor's confidential information for any purposes other than carrying out the purposes of the agreement, and from disclosing Accelor's confidential information to third parties.

## IV.    DEFENDANTS' BREACHES OF CONTRACT AND MISAPPROPRIATION OF ACCELOR'S TRADE SECRETS

### A.    HIRC'S Copying and Use of Accelor's Confidential and Trade Secret Information Without Authorization to Create a Competing Supply Chain Risk Management Product

59.    Mayo gave Schafer, its employee, access to Accelor's confidential information, including the SRS Questionnaire, SRS Data Repository, and the SRS Mapping.

60.    Pursuant to the Terms of the 2018 Confidentiality Agreement, the 2018 PEA, the

2019 Confidentiality Agreement, the 2019 Master Agreement, and the SRS Terms of Service, Schafer was expressly bound by the confidentiality provisions of those agreements.

61.     In 2021, Schafer became the Executive Director of HIRC. He continued to be an employee of Mayo, however, and continued to be paid his salary by Mayo.

62.     In March 2025, Accelor learned that Mayo and HIRC, at Schafer's direction, continued to use Accelor's confidential and trade secret information without authorization, including the SRS Questionnaire, SRS Data Repository, and SRS Mapping, incorporating them into a derivative supply chain risk management product (the "Mayo and HIRC Supply Chain Risk Product") that HIRC offers in competition with Accelor products. HIRC makes the Mayo and HIRC Supply Chain Risk Product available to its healthcare provider members and others through a product that HIRC called "Vault." This unauthorized use of Accelor's confidential and trade secret information by Mayo and HIRC continues despite repeated written Accelor requests to Mayo and HIRC to terminate such use.

63.     The Vault includes risk assessment questions for measuring supplier risk management capabilities. HIRC provides feedback to suppliers on their capability gaps based on supplier responses to those risk assessment questions, provides instructions to improve capabilities having gaps, and follows-up to ensure that the capabilities and capability improvements remain in place, which are core features of the SRS Questionnaire. The Vault also includes a data repository for storing supply chain risk information collected from suppliers and for managing permissions for which organizations can access that information, which are core features of the SRS Data Repository. The Vault also includes templates for collecting data about the supply chain network including supplier and sub-tier site locations, site operations, relationships between sites, and items related to those sites, which are core features of SRS Mapping.

64.    During HIRC Member Calls on March 28, 2025, and April 25, 2025, Schafer announced that HIRC planned to use the Mayo and HIRC Supply Chain Risk Product on the HIRC Vault to share Accelor's confidential and trade secret information, including the SRS Questionnaire, SRS Data Repository, and SRS Mapping, with HIRC Healthcare Provider Members and with third parties, including Clarium, Inc., a competitor of Accelor ("Clarium"), Vizient, Premier Inc., and Accenture. Accelor does not, and has not, authorized such disclosures or uses of its confidential and trade secret information.

65.    HIRC and Schafer copied the proprietary and trade secret SRS Questionnaire directly into different formats (Excel and PDF) and released them rebranded as HIRC materials, without permission from, or attribution to, Accelor.

66.    HIRC and Schafer designed and published a service that asks suppliers to complete a risk assessment questionnaire that incorporates important features and methods of the proprietary and trade secret SRS Questionnaire.

67.    HIRC and Schafer developed and marketed the Mayo and HIRC Supply Chain Risk Product, which is expressly designed to gather, store, and share with external organizations information developed using Accelor's confidential and trade secret information, including the SRS Questionnaire, SRS Data Repository, and SRS Mapping.

68.    The Mayo and HIRC Supply Chain Risk Product is derivative of Accelor's proprietary products and services and reproduces many key capabilities of the SRS Product.

69.    For example, the Mayo and HIRC Supply Chain Risk Product, like the SRS Product, is a Software as a Service technology platform hosted by Microsoft, uses a User Authentication System hosted by Microsoft, incorporates a data repository consisting of at least a multi-level healthcare supply chain network including healthcare providers, suppliers, distributors,

and service providers, with contact and site information for organizations in the multi-level supply chain network. The site information for the suppliers, distributors, and service providers includes site address location, site operations activities, supply chain network level, site products, component suppliers for each supplier (the next supply chain network level, also known as "subtier suppliers") and the site information for each subtier supplier. The Mayo and HIRC Supply Chain Risk Product, like the SRS Product, includes a risk assessment questionnaire for suppliers, distributors, and service providers, an evidence requirement for affirmative response to at least some questions, feedback on areas to improve based on responses, and ratings and scores based on responses.

70.     The Mayo and HIRC Supply Chain Risk Product, like the SRS Product, incorporates a Permission-based system enabling suppliers to control which organizations can and cannot view their data.

71.     The Mayo and HIRC Supply Chain Risk Product, like the SRS Product, incorporates a database connecting users to their organizations and enabling users to view only permitted data.

72.     The Mayo and HIRC Supply Chain Risk Product, like the SRS Product, incorporates monitoring of supply chain risk events, supply chain risk event alerts, and supply chain risk event impact surveys to identify the impact of risk events on suppliers, distributors, and service providers.

73.     The Mayo and HIRC Supply Chain Risk Product, like the SRS Product, uses methods such as requirements for suppliers, distributors, and service providers to refresh the data every year and receive a new rating and score, and support service and online training for healthcare providers, suppliers, distributors, and service providers to help them use the system.

- 14 -

74.     HIRC and Schafer designed and built into the Mayo and HIRC Supply Chain Risk Product a technology that mimics the industry-first technology that Accelor introduced into the SRS Data Repository in 2020 that enables suppliers and distributors to control view access to their data by external organizations.

75.     In an April 25, 2025, email to Patrick Brennan, the founder and owner of Accelor, Schafer did not deny that HIRC and Schafer had used Accelor's information in creating HIRC's risk assessment questionnaire called at that time the BCM Assessment. Schafer falsely asserted that "Mayo and SRS jointly developed" Accelor's confidential and trade secret information, and that "Mayo had all rights to contribute the jointly owned intellectual property to the standard." Mayo did not "jointly develop" with Accelor the confidential and trade secret information at issue in this Complaint, including the SRS Questionnaire, SRS Data Repository, and SRS Mapping.

76.     HIRC's and Schafer's actions, as enabled and permitted by Mayo, constitute a breach by Mayo and Schafer of the 2019 Master Agreement, a breach by HIRC of the HIRC Agreement, and the misappropriation of Accelor's confidential and trade secret information.

**B.     HIRC'S Threatened Disclosure of Accelor's Trade Secrets and Confidential Information to Clarium**

77.     In 2025, Accelor learned that HIRC and Clarium planned to use Accelor's confidential and trade secret information to build a competing product that would be operated by Clarium. For example, in a joint press release in July 2024, HIRC and Clarium announced their agreement to "co-develop a new AI-powered healthcare supply chain resiliency tool for providers, suppliers, and other industry partners." The press release linked directly to a web page where anyone could view and download the "BCM Template" of the SRS Questionnaire. The same HIRC webpage includes SRS methods including the SRS Data Repository, SRS Mapping, and the SRS Questionnaire.

- 15 -

## V.    DEFENDANTS' INFRINGEMENT OF THE '804 PATENT

78.    The Mayo and HIRC Supply Chain Risk Product meets every limitation of at least Claim 1 of the '804 Patent either literally or under the doctrine of equivalents in substantially the same way.  One example of such infringement is provided in the paragraphs below.

79.    The Mayo and HIRC Supply Chain Risk Product implements a computer-implemented method of managing partner organizations, comprising the limitations of claim 1 of the '804 Patent.

80.    The Mayo and HIRC Supply Chain Risk Product defines, for each partner organization, the partner organizations that consume what it produces and the partner organizations that produce what it consumes, wherein the partner organizations form a consumer/producer hierarchy of three or more layers, including a first, second and third layer, wherein the partner organizations include a consumer/producer at the third layer, a first and a second consumer/producer at the second layer, and a first and a second consumer/producer at the first layer, wherein the first and second consumer/producers at the second layer are consumers of the consumer/producer at the third layer and wherein the first and second consumer/producers at the first layer are consumers of each of the consumer/producers at the second layer.

81.    The Mayo and HIRC Supply Chain Risk Product defines partner capability objectives associated with defining, in a computer, partner capability objectives associated with the partner organizations at each of the first, second and third layer.

82.    The Mayo and HIRC Supply Chain Risk Product generates partner capability questions corresponding to one or more of the defined partner capability objectives, transmitting the questions across the external network to the partner organizations and automatically collecting partner capability facts from the partner organizations.

83.    The Mayo and HIRC Supply Chain Risk Product identifies gaps in partner capabilities as a function of the collected partner capability facts.

84.    The Mayo and HIRC Supply Chain Risk Product selects one or more partner capabilities.

85.    The Mayo and HIRC Supply Chain Risk Product automatically improves the selected partner capabilities, wherein automatically improving includes informing partner organizations at the second and third layers of gaps in their capabilities via the external network, automatically collecting via the external network partner capability facts relevant to the gaps, measuring improvement in the selected partner capabilities, and promulgating information regarding the measured improvements up through the consumer/producer hierarchy to each of the partner organizations that depend on that consumer/producer, wherein promulgating includes sending capability information received from the consumer/producer at the third layer through each of the consumer/producers at the second layer to each of the consumer/producers at the first layer.

86.    The Mayo and HIRC Supply Chain Risk Product monitors partner capabilities, in a computer, to ensure that improvements remain in place, wherein monitoring includes defining a monitoring plan and implementing the monitoring plan, wherein monitoring produces current partner capability information.

87.    The Mayo and HIRC Supply Chain Risk Product stores current partner capability information in the database.

88.    The Mayo and HIRC Supply Chain Risk Product reports to each partner organization the current partner capability information associated with partner organizations for which they are a consumer, wherein reporting includes reporting current partner capability

information from partner organizations on the third layer up through partner organizations on the second layer to partner organizations on the first layer.

89.    Defendants had actual knowledge of the '804 Patent.

## VI.    DEFENDANTS' INFRINGEMENT OF THE '754 PATENT

90.    The Mayo and HIRC Supply Chain Risk Product meets every limitation of at least Claim 1 of the '754 Patent either literally or under the doctrine of equivalents in substantially the same way. One example of such infringement is provided in the paragraphs below.

91.    The Mayo and HIRC Supply Chain Risk Product implements a computer-implemented method of managing supply chains across a plurality of separate organizations, wherein the plurality of separate organizations include a first organization and a second organization, comprising the limitations of claim 1 of the '754 Patent.

92.    The Mayo and HIRC Supply Chain Risk Product defines a supply chain hierarchy for the supply chains, the supply chain hierarchy defining, for each organization, the organizations in the supply chain hierarchy that supply items to the respective organization and the organizations in the supply chain hierarchy that receive items supplied by the respective organization, wherein each item includes one or more of a product or a service.

93.    The Mayo and HIRC Supply Chain Risk Product creates a supply chain database on a database management system, the database management system connected to a network, wherein the supply chain database includes a plurality of item records which reflect the hierarchy of one or more of the supply chains, wherein each item record is associated with one of the items, wherein each item record is also associated with the organization that supplies the item and wherein each item record includes supply chain risk management information for each of the associated respective items, wherein the database management system includes a database schema

- 18 -

used to define how the item records are stored in the supply chain database.

94.    The Mayo and HIRC Supply Chain Risk Product associates one or more users with each organization, wherein associating includes authenticating the user and creating permissions that provide the user with remote access over the network to the item records of the user's organization in the supply chain database while preventing access to the item records stored in the supply chain database associated with one or more of the other organizations in the supply chain hierarchy.

95.    The Mayo and HIRC Supply Chain Risk Product receives, from the network and at the database management system, from one of the users, information associated with one of the item records, wherein the information received is in a non-standardized format, wherein receiving information includes authenticating the user submitting the information to ensure the user has permission to modify the respective item record.

96.    The Mayo and HIRC Supply Chain Risk Product updates the respective item record based on the information received from the respective user, wherein updating includes converting the information received in the non-standardized format to a standardized format, validating the information and storing the validated information to the respective item record, wherein validating includes sending an error message to the user over the network based at least in part on information from the database management system if corrections are needed.

97.    The Mayo and HIRC Supply Chain Risk Product receives, from a user associated with the first organization, a request to update the supply chain risk management information of one of the item records associated with the second organization.

98.    The Mayo and HIRC Supply Chain Risk Product conveys the request to one or more users associated with the second organization.

99.    The Mayo and HIRC Supply Chain Risk Product receives, from one of the one or more users associated with the second organization, updated supply chain risk management information.

100.    The Mayo and HIRC Supply Chain Risk Product stores the updated supply chain risk management information in the appropriate item record.

101.    The Mayo and HIRC Supply Chain Risk Product detects a supply chain risk event impacting one of the items in the item record subject to the request, wherein detecting including receiving information regarding the supply chain risk event over the network from a collaborative source.

102.    The Mayo and HIRC Supply Chain Risk Product generates, based at least in part on the updated supply chain risk management information and on the information received from the collaborative source regarding the supply chain risk event, a report for each organization impacted by the supply chain risk event, wherein the report indicates the items at risk because of the supply chain risk event.

103.    The Mayo and HIRC Supply Chain Risk Product sending the report in real time over the network via messaging software executing on the database management system to each organization impacted by the supply chain risk event.

104.    Defendants had actual knowledge of the '754 Patent.

## COUNT I
## Infringement of U.S. Patent No. 8,515,804 (Against All Defendants)

105.    Accelor realleges and incorporates by reference the allegations set forth in paragraphs 1-104 of this Complaint.

106.    Brennan owns all right, title, and interest in U.S. Patent No. 8,515,804, which issued on August 20, 2013.

107.    Accelor is the exclusive licensee of the '804 Patent.

108.    The '804 Patent is valid, subsisting, and in full force and effect.

109.    Defendants have infringed, and are directly, knowingly and actively infringing at least one claim of the '804 Patent, including, without limitation, Claim 1, through the use of the Mayo and HIRC Supply Chain Risk Product.

110.    Mayo and Schafer have induced infringement of at least one claim of the '804 Patent, including, without limitation, Claim 1.  HIRC directly infringes the '804 Patent by using the Mayo and HIRC Supply Chain Risk Product; Mayo and Schafer knew of the '804 Patent, and nevertheless knowingly encouraged and induced HIRC to infringe the '804 Patent.

111.    Defendants' infringing activities have caused and will continue to cause loss and injury to Accelor, for which Accelor is entitled to monetary damages and injunctive relief.

112.    Accelor provided Defendants with actual notice of its infringement of the '804 Patent.

113.    Upon information and belief, Defendants' infringement was and continues to be intentional, knowing, willful, deliberate, without license or justification, and with full knowledge of Accelor's patent rights.

114.    Because of Defendants' willful conduct, Accelor is entitled to recover three times its damages, as well as lost profits, costs, attorneys' fees and investigative fees.

115.    By infringing Accelor's patents, Defendants' have caused, and will continued to cause, Accelor irreparable injury and damage for which Accelor has no adequate remedy at law, unless and until this Court enjoins Defendants.

116.    Accelor is entitled to preliminary and permanent injunctive relief to prevent further infringement of the '804 Patent. Section 14.2 of the 2019 Master Agreement contemplates the

grant of injunctive relief. The injunctive relief sought by Accelor will not impact Mayo's ability to serve its patients, and therefore is not prohibited by the 2019 Master Agreement.

## <u>COUNT II</u>
### <u>Infringement of U.S. Patent No. 10,853,754 (Against All Defendants)</u>

117.    Accelor realleges and incorporates by reference the allegations set forth in paragraphs 1-116 of this Complaint.

118.    Brennan owns all right, title, and interest in U.S. Patent No. 10,853,754, which issued on December 1, 2020.

119.    Accelor is the exclusive licensee of the '754 Patent.

120.    The '754 Patent is valid, subsisting, and in full force and effect.

121.    Defendants have infringed, and are directly, knowingly and actively infringing at least one claim of the '754 Patent, including, without limitation, Claim 1, through the use of the Mayo and HIRC Supply Chain Risk Product.

122.    Mayo and Schafer have induced infringement of at least one claim of the '754 Patent, including, without limitation, Claim 1.  HIRC directly infringes the '754 Patent by using the Mayo and HIRC Supply Chain Risk Product; Mayo and Schafer knew of the '754 Patent, and nevertheless knowingly encouraged and induced HIRC to infringe the '754 Patent.

123.    Defendants' infringing activities have caused and will continue to cause loss and injury to Accelor, for which Accelor is entitled to monetary damages and injunctive relief.

124.    Accelor provided Defendants with actual notice of its infringement of the '754 Patent.

125.    Upon information and belief, Defendants' infringement was and continues to be intentional, knowing, willful, deliberate, without license or justification, and with full knowledge of Accelor's patent rights.

- 22 -

126.    Because of Defendants' willful conduct, Accelor is entitled to recover three times its damages, as well as lost profits, costs, attorneys' fees and investigative fees.

127.    By infringing Accelor's patents, Defendants' have caused, and will continued to cause, Accelor irreparable injury and damage for which Accelor has no adequate remedy at law, unless and until this Court enjoins Defendants.

128.    Accelor is entitled to preliminary and permanent injunctive relief to prevent further infringement of the '754 Patent. Section 14.2 of the 2019 Master Agreement contemplates the grant of injunctive relief. The injunctive relief sought by Accelor will not impact Mayo's ability to serve its patients, and therefore is not prohibited by the 2019 Master Agreement.

## COUNT III
## Breach of Contract (Against Mayo and Schafer)

129.    Accelor realleges and incorporates by reference the allegations set forth in paragraphs 1-128 of this Complaint.

130.    The 2019 Master Agreement is a valid and binding contract between Accelor and Mayo. Pursuant to the confidentiality provision of the 2019 Master Agreement, Schafer is bound by the terms of the 2019 Master Agreement.

131.    The 2019 Master Agreement imposed a continuing duty of non-disclosure and non-use on Mayo and Schafer.

132.    Mayo and Schafer breached the 2019 Master Agreement by using Accelor's confidential information when they disclosed Accelor's confidential information to HIRC, knowing that HIRC would use Accelor's confidential information without authorization to create the Mayo and HIRC Supply Chain Risk Product.

133.    Mayo's and Schafer's breaches of the 2019 Master Agreement have harmed Accelor in an amount to be determined at trial.

134.    Accelor is entitled to preliminary and permanent injunctive relief to prevent further breach of the 2019 Master Agreement by Mayo and Schafer. Section 14.2 of the 2019 Master Agreement contemplates the grant of injunctive relief. The injunctive relief sought by Accelor will not impact Mayo's ability to serve its patients, and therefore is not prohibited by the 2019 Master Agreement.

## COUNT IV
## Breach of Contract (Against HIRC)

135.    Accelor realleges and incorporates by reference the allegations set forth in paragraphs 1-134 of this Complaint.

136.    The HIRC Agreement is a valid and binding contract between Accelor and HIRC.

137.    The HIRC Agreement imposed a continuing duty of non-disclosure and non-use on HIRC.

138.    HIRC breached the HIRC Agreement by using Accelor's confidential information to create the Mayo and HIRC Supply Chain Risk Product.

139.    HIRC's breaches of the HIRC Agreement have harmed Accelor in an amount to be determined at trial.

140.    Accelor is entitled to preliminary and permanent injunctive relief to prevent further breach of the HIRC Agreement by HIRC.

## COUNT V
## Misappropriation of Trade Secrets Under the Federal Defend Trade Secrets Act
## (Against All Defendants)

141.    Accelor realleges and incorporates by reference the allegations set forth in paragraphs 1-140 of this Complaint.

142.    Accelor had protectable trade secrets in connection with its SRS Product, including at least the SRS Questionnaire, SRS Data Repository, and SRS Mapping.

143.    Accelor confidentially disclosed trade secret information to Defendants.

144.    Defendants subsequently caused at least one trade secret owned by Accelor to be disclosed to third parties and to be used in the development of the Mayo and HIRC Supply Chain Risk Product.

145.    Defendants did not have Accelor's express or implied consent to disclose Accelor's trade secrets.

146.    Defendants, at the time of disclosure, knew or should have known that their knowledge of Accelor's trade secret information was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

147.    As a direct and proximate result of Defendants' unauthorized disclosure of Accelor's trade secret information, Accelor has suffered monetary damages in an amount to be established at trial.

148.    Without authorization, Defendants have used to their benefit and to Accelor's detriment Accelor's trade secret information.

149.    Accelor is entitled to preliminary and permanent injunctive relief to prevent further misappropriation of its trade secrets.

## COUNT VI
### Misappropriation of Trade Secrets Under the Delaware Uniform Trade Secrets Act
### (Against All Defendants)

150.    Accelor realleges and incorporates by reference the allegations set forth in paragraphs 1-149 of this Complaint.

151.    Accelor had protectable trade secrets in connection with its SRS Product, including at least the SRS Questionnaire, SRS Data Repository, and SRS Mapping.

152.    Accelor confidentially disclosed trade secret information to Defendants.

153.    Defendants subsequently caused at least one trade secret owned by Accelor to be disclosed to third parties and to be used in the development of the Mayo and HIRC Supply Chain Risk Product.

154.    Defendants did not have Accelor's express or implied consent to disclose Accelor's trade secrets.

155.    Defendants, at the time of disclosure, knew or should have known that their knowledge of Accelor's trade secret information was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

156.    As a direct and proximate result of Defendants' unauthorized disclosure of Accelor's trade secret information, Accelor has suffered monetary damages in an amount to be established at trial.

157.    Without authorization, Defendants have used to their benefit and to Accelor's detriment Accelor's trade secret information.

158.    Accelor is entitled to preliminary and permanent injunctive relief to prevent further misappropriation of its trade secrets.

## COUNT VII
### Misappropriation of Confidential Information (Against All Defendants)

159.    Accelor realleges and incorporates by reference the allegations set forth in paragraphs 1-158 of this Complaint.

160.    Accelor had a property interest in confidential information in connection with its SRS Product, including at least the SRS Questionnaire, SRS Data Repository, and SRS Mapping.

161.    Accelor confidentially disclosed its confidential information to Defendants.

162.    Defendants subsequently wrongfully exerted dominion over the confidential information by using it to create the Mayo and HIRC Supply Chain Risk Product.

163.    As a direct and proximate result of Defendants' misappropriation of Accelor's confidential information, Accelor has suffered monetary damages in an amount to be established at trial.

164.    Accelor is entitled to preliminary and permanent injunctive relief to prevent further misappropriation of its confidential information.

### COUNT VIII
### Conversion (Against All Defendants)

165.    Accelor realleges and incorporates by reference the allegations set forth in paragraphs 1-164 of this Complaint.

166.    Defendants exercised control over at least one of Accelor's trade secrets and/or other confidential information relating to the SRS Product, including without limitation the SRS Questionnaire, SRS Data Repository, and SRS Mapping.

167.    Defendants' exercise of control over Accelor's trade secrets and/or other confidential information is contrary to Accelor's right to the property, is in repudiation of Accelor's right to the property, and/or intentionally deprives Accelor of possession of the trade secrets and/or other confidential information permanently or for an indefinite period of time.

### COUNT IX
### Unjust Enrichment (Against All Defendants)

168.    Accelor realleges and incorporates by reference the allegations set forth in paragraphs 1-167 of this Complaint.

169.    Defendants have been unjustly enriched by their unlawful and unauthorized use of Accelor's confidential information.

170.    Allowing Defendants to maintain the benefit they obtained through the unlawful and unauthorized use of Accelor's confidential information would be unjust and unwarranted.

## COUNT X
## Constructive Trust (Against All Defendants)

171.    Accelor realleges and incorporates by reference the allegations set forth in paragraphs 1-170 of this Complaint.

172.    Defendants have been unjustly enriched by their unauthorized use of and/or exercise of control over Accelor's trade secrets and/or confidential information.

173.    To prevent further unjust enrichment, Accelor is entitled to the imposition of a constructive trust, forcing Defendants to assign all of their rights to Accelor's trade secrets and/or confidential information in their possession to Accelor.

## PRAYER FOR RELIEF

WHEREFORE, Accelor and Brennan respectfully request that the Court:

1.    Enter judgment in favor of Accelor that the '804 and '754 Patents are valid and enforceable and infringed by Mayo, HIRC, and Schafer;

2.    Enter preliminary and permanent injunctions enjoining Defendants from infringing the '804 and '754 Patents or, alternatively, awarding Accelor ongoing royalties;

3.    Award Accelor monetary relief, including but not limited to that available under 35 U.S.C. § 284;

4.    Award Accelor compensatory and exemplary damages, but not less than a reasonable royalty, including allowance of multiplied damages based on Defendants' willful infringement;

5.    Enter judgment in favor of Accelor that the 2019 Master Agreement and the HIRC Agreement are valid and enforceable and were breached by Mayo/Schafer and HIRC, respectively;

6.    Award Accelor compensatory damages for Mayo's, HIRC's and Schafer's breaches

of the 2019 Master Agreement and HIRC Agreement;

7.     Award Accelor its costs incurred herein, including attorneys' fees for an exceptional case pursuant to 35 U.S.C. § 285;

8.     Award Accelor damages for Defendants' misappropriation of Accelor's trade secrets and confidential information;

9.     Award Accelor damages for Defendants' conversion of Accelor's trade secrets and confidential information;

10.    Enter judgment requiring Defendants to make restitution to remedy Mayo's, HIRC's, and Schafer's unjust enrichment;

11.    An order imposing a constructive trust requiring Defendants to assign all rights in the Accelor trade secrets and confidential information to Accelor;

12.    Enjoining Defendants from further unlawful activity; and

13.    Enter judgment awarding Accelor such other and further relief as the Court may deem just and equitable.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Accelor hereby demands a jury trial as to all issues so triable.

[Signature on next page.]

Of Counsel (*pro hac vice* to be filed):

PADMANABHAN & DAWSON, P.L.L.C.

Devan V. Padmanabhan
Paul J. Robbennolt
Erin O. Dungan
Britta S. Loftus
45 South 7th Street, Suite 2315
Minneapolis, MN  55402
Tel: 612-444-3601
devan@paddalawgroup.com
paul@paddalawgroup.com
erin@paddalawgroup.com
britta@paddalawgroup.com


Dated:  August 7, 2025
Wilmington, Delaware

**BERGER MCDERMOTT LLP**

*/s/ Peter C. McGivney*
Peter C. McGivney (No. 5779)
Zachary J. Schnapp (No. 6914)
Charmi A. Patel (No. 7248)
1105 N. Market Street, Suite 1100
Wilmington, Delaware 19801
(302) 655-1140
pmcgivney@bergermcdermott.com
zschnapp@bergermcdermott.com
cpatel@bergermcdermott.com

*Attorneys for Plaintiffs Accelor Corp.
and Patrick Brennan*